```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

***************************

FRACTUS, S.A.,
    Plaintiff

vs.                                    Case No. 1:18-mc-91395-PBS

IDC RESEARCH, INC.,
    Defendant

***************************

```
                    TRANSCRIPT OF MOTION HEARING
                BEFORE THE HONORABLE MARIANNE B. BOWLER
                      AT BOSTON, MASSACHUSETTS
                        ON OCTOBER 30, 2018
```

APPEARANCES:

For the Plaintiff:
Lucas I. Silva, Esquire
Foley & Lardner, LLP
111 Huntington Avenue, Suite 2500
Boston, Massachusetts 02199
617-342-4000

Guillermo A. Alarcon, Esquire
Susman Godfrey, LLP
1000 Louisiana, Suite 5100
Houston, TX 77002
713-653-7828


Transcriber:  Karen M. Aveyard,
              Approved Federal Court Transcriber

---

**TRANSCRIPTION PLUS**
**1334 ELM STREET**
**LEOMINSTER, MASSACHUSETTS 01453**
**(978) 466-9383**
**k.aveyard@comcast.net**

APPEARANCES (continued):

<u>For the Defendant:</u>
David Bliss Wilson, Esquire
Hirsch Roberts Weinstein
24 Federal Street, 12th Floor
Boston, Massachusetts 02110
617-348-4314

Leigh A. Mills, Esquire
International Data Group
5 Speen Street, 3rd Floor
Framingham, Massachusetts 01701
508-988-6727

```
 1                    P R O C E E D I N G S

 2

 3            THE CLERK:  The United States District Court for the

 4   District of Massachusetts is now in session, the Honorable

 5   Marianne B. Bowler presiding.  Today is October 30, 2018.  The

 6   case of Fractus, S.A. versus IDC Research, Inc., Miscellaneous

 7   Case 18-91395, will now be heard before the Court.

 8            Will counsel please identify yourselves for the

 9   record.

10            MR. SILVA:  Good afternoon, your Honor.  On behalf of

11   the movant, Fractus, Luke Silva of Foley & Lardner.

12            THE COURT:  Thank you very much.

13            MR. SILVA:  And Guillermo Alarcon from Susman Godfrey.

14            MR. ALARCON:  Good afternoon, your Honor.

15            THE COURT:  Thank you very much.

16            MR. WILSON:  Your Honor, David Wilson from Hirsch

17   Roberts Weinstein here in Boston, and inhouse counsel from IDC,

18   Leigh Mills.

19            THE COURT:  Thank you very much.

20            Well, we're here for Docket Entry No. 1, which is

21   plaintiff's Motion to Compel.  My way of going through this is

22   to have you go through the items one by one, tell me what

23   you're looking for, you tell me why you don't to produce, and

24   then I'll make a decision.

25            (Pause.)
```

```
1             THE COURT:  Don't all jump at once.
2             MR. ALARCON:  Your Honor, I don't know if you have a
3   copy of the motion in front of you.
4             THE COURT:  I have all the papers, yeah.
5             MR. ALARCON:  I have a copy where I've highlighted the
6   ones that are still -- that we think are unresolved.
7             THE COURT:  Well, you can tell me by number.
8             MR. ALARCON:  Okay.
9             (Pause.)
10            MR. ALARCON:  Your Honor, the first one is Request
11  No. 1, which asks for documents relating to IDC's calculations
12  of the accused products.  I guess I should say at this time we
13  had originally requested documents related to all 42 of the
14  products that have been accused in the underlying litigation.
15  Through negotiations we've limited that to ten items.
16            So the requests that remain outstanding, there are six
17  of them, all sort of relate to that.  It's communications and
18  documents related to IDC's sources, and its internal
19  communications about its calculations.
20            THE COURT:  Alright.  Let me hear from your brother.
21            MR. WILSON:  Thank you, your Honor.
22            Your Honor, IDC has a product, a tracker product, that
23  deals with market, vendor and forecasting --
24            THE COURT:  You can sit.
25            MR. WILSON:  -- and in this case, specifically, I
```

1   think what Fractus is looking for is our worldwide quarterly
2   mobile phone tracker, which we put that information out every
3   quarter, and both ZTE and Fractus are clients ours and we give
4   them that information.  So they have that information.
5       What they are asking us to do though is to give them
6   all the backup for how we actually calculate that information,
7   and we have analysts, very experienced analysts, that get
8   information from four sources:  Supply side, from our channel
9   partners, from demand side research, and then also additional
10  secondary sources.  We take all that and the analysts, based on
11  their experience, they put together and come out with these
12  estimated numbers and forecasts.
13      These two parties, Fractus and ZTE, are in some type
14  of patent litigation, and apparently the numbers that we've
15  come out with are different than the numbers that ZTE has come
16  out with.  I think Fractus admits in the papers we're a
17  recognized source.  They even cite to, in the first paragraph
18  of their reply to the Ericsson case, where we were recognized
19  by some other judges.
20      I do say, in the Ericsson case, we supplied that
21  information.  Ericsson came to us, asked for permission.  We
22  gave them permission to use those numbers that they purchased
23  from us.  But they didn't ask us for any of the backup, and
24  we've never given the backup in how we calculate that to
25  anybody.  So they're essentially asking us to turn over our

1  proprietary trade secret information that companies pay us
2  millions of dollars a year for and that's why we're really
3  here.
4         And to the credit of Fractus, we have had
5  negotiations.  We've been able to narrow this.  But the bottom
6  line is we don't want to give away our proprietary method for
7  making these calculations.
8         THE COURT:  That sounds pretty reasonable to me.
9         Why shouldn't I accept your brother's argument?
10         MR. ALARCON:  Well, your Honor, we know that IDC is
11  not getting its numbers from ZTE.  Nonetheless, IDC has been
12  recognized as a reliable source, and it's reliability has been
13  put at issue in this litigation.
14         Therefore, the backup information that it uses is
15  relevant to the case and it's not something we can get from any
16  other source.  It's something we need, given the huge
17  discrepancy between IDC and ZTE's numbers.
18         As for the --
19         THE COURT:  Have you taken any depositions?
20         MR. ALARCON:  Of ZTE, your Honor?  Yes.
21         THE COURT:  Well, I'm not convinced you need it at
22  this time, so denied.
23         Next.  Next request.
24         MR. ALARCON:  Well, the next request is Request No. 5.
25  It relates to all communications between IDC and third parties

1   that have the sales numbers for the ten accused products that
2   we're requesting.
3           THE COURT:  Again?
4           I'll hear from your brother.
5           MR. WILSON:  So here, if I understand the request
6   correctly, your Honor, is they're looking for -- and I'm not
7   sure they understand, but they think that we're just -- we go
8   to somebody and say give us your sales data, and that's really
9   not the way it happens.  We gather forecasting from supply
10  side, we look at channel partners, we do our demand side
11  research, and we look at our own forecasting to come up with
12  those numbers.
13          So, again, I think it's not as simple as the request
14  portrays it.  Again, it's really looking at the proprietary way
15  that we go about gathering the information.
16          THE COURT:  Well, I have to agree.  I mean, you're
17  looking for proprietary information here.  It's just not that
18  simply produced.
19          MR. ALARCON:  Well, your Honor, we're asking for that
20  and for the underlying data.
21          THE COURT:  You want it all.
22          MR. ALARCON:  I believe this particular request is
23  more specific towards the underlying data which would not be
24  trade secrets or proprietary because it's something they're
25  getting from third parties.

1                And with respect to the trade secrets and proprietary
2    information --
3            THE COURT:  You've had a meet and confer?
4            MR. ALARCON:  Yes.
5            THE COURT:  Yeah.
6            MR. ALARCON:  With respect to that, we just don't know
7    enough about their sources, so, I mean, some of these --
8            THE COURT:  Well, have you deposed them?
9            MR. ALARCON:  IDC?
10           THE COURT:  Yeah.
11           MR. ALARCON:  No, your Honor.
12           THE COURT:  Well, isn't that the place to start?
13           MR. ALARCON:  Well, yes, we could have, but our
14   position is that a deposition would have been more fruitful if
15   we had the underlying documents.  We could get --
16           THE COURT:  I think the best way to proceed is to have
17   a deposition, see what you can get, and then come back and
18   renew these requests if you don't have what you need.
19           MR. ALARCON:  We would be amenable to postponing these
20   proceedings so that we could take a deposition of an IDC
21   representative.
22           THE COURT:  Alright.  You can provide the right
23   person.  You know, it may be that you instruct them not to
24   respond to certain things, but I think at least it might be
25   able -- he might be able to tease out some information that

1    would be helpful.
2        MR. WILSON:  So, your Honor, maybe on the timing on
3    this too, they're compelling -- they're trying to get the
4    information from ZTE and ZTE has objected to that, and they're
5    sort of fighting through that.  We feel like we're the third
6    party sitting here getting sort of caught between these two
7    giants that are having this patent fight.
8        Is it possible that maybe they first work through
9    their discovery with ZTE, and then if still there's --
10       THE COURT:  What is your discovery schedule in the
11   case in chief?
12       MR. ALARCON:  Your Honor, the case just got
13   transferred before fact discovery had closed.  We're not sure
14   what's going to happen.  We just got assigned a new judge.
15       We do have --
16       THE COURT:  So is fact discovery technically closed at
17   this time?
18       MR. ALARCON:  Well, we have --
19       THE COURT:  In which case this motion is
20   inappropriate.
21       MR. ALARCON:  Well, we have pending Motions to Compel.
22   We had a deadline to file Motions to Compel and this --
23       THE COURT:  And what was that deadline?
24       MR. ALARCON:  It was September -- it was
25   mid-September.  It was this -- I don't remember the exact date,

1   but this motion was filed within the deadline.

2             THE COURT: Well, the deadline is important to me.

3   You should know that. Look at your -- you must have it in your

4   notes someplace.

5             MR. ALARCON: I believe it was...

6             (Pause.)

7             MR. ALARCON: September 17th, your Honor.

8             THE COURT: On the day you filed the motion.

9             MR. ALARCON: Yes.

10            THE COURT: Alright. Well, I would say the motion is

11  denied without prejudice at this time. It can be renewed if

12  discovery is opened up so that you can take a deposition. But

13  if you didn't take the deposition prior to this date and you

14  don't get more discovery, I think you might be out of luck.

15            So denied without prejudice at this time.

16            MR. WILSON: Thank you, your Honor.

17            THE COURT: You're welcome.

18

19            (The hearing was concluded.)

20

21

22

23

24

25

C E R T I F I C A T I O N

I, Karen M. Aveyard, Approved Federal Court Transcriber, do hereby certify that the foregoing transcript, consisting of 10 pages, is a correct transcript prepared to the best of my skill, knowledge and ability from the official digital sound recording of the proceedings in the above-entitled matter.

/s/ Karen M. Aveyard

Karen M. Aveyard

November 2, 2018

Date